**BURSOR & FISHER, P.A.**
L. Timothy Fisher (SBN 191626)
Luke Sironski-White (SBN. 348441)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: *ltfisher@bursor.com*
*lsironski@bursor.com*

**SINDERBRAND LAW GROUP, P.C.**
Greg Sinderbrand (SBN. 179586)
2829 Townsgate Road, Suite 100
Westlake Village, CA 91361
Telephone: (818) 370-3912
E-mail: *greg@sinderbrandlaw.com*

**KAPLAN FOX & KILSHEIMER LLP**
Justin B. Farar (SBN 211556)
12400 Wilshire Boulevard, Suite 910
Los Angeles, CA 90025
Telephone: (310) 614-7260
Email: *jfarar@kaplanfox.com*

Laurence D. King (SBN 206423)
Matthew B. George (SBN 239322)
Blair E. Reed (SBN 316791)
Sophia V. Pintar (SBN 367193)
1999 Harrison Street, Suite 1501
Oakland, CA 94612
Telephone: (415) 772-4700
Facsimile: (415) 772-4707
Email: *lking@kaplanfox.com*
*mgeorge@kaplanfox.com*
*breed@kaplanfox.com*
*spintar@kaplanfox.com*

*Co-Lead Interim Class Counsel and Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MELISSA JACOBS, CARYN HART, CLARE ERSLEV, and ANISE IVEY, individually, and on behalf of all others similarly situated,<br><br>Plaintiffs,<br>v.<br><br>NIAGEN BIOSCIENCE, INC., and CHROMADEX, INC.,<br><br>Defendants. | Case No. 8:26-cv-01365-FWS KES<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br><u>JURY TRIAL DEMANDED</u> |

Plaintiffs Melissa Jacobs, Caryn Hart, Clare Erslev, and Anise Ivey ("Plaintiffs") bring this action on behalf of themselves, and all others similarly situated, against Niagen Bioscience, Inc., and ChromaDex, Inc., ("Defendants"). Plaintiffs make the following allegations pursuant to the investigation of Plaintiffs' counsel and based upon information and belief, except as to the allegations specifically pertaining to Plaintiffs, which are based on personal knowledge.

## NATURE OF THE ACTION

1. This is an action arising from the false and misleading representations that Defendants made for years concerning their Tru Niagen nicotinamide riboside ("NR") dietary supplements (the "Products").

2. Specifically, Defendants falsely construed scientific data by representing that the Products were "clinically proven" to significantly increase levels of nicotinamide adenine dinucleotide ("NAD+") and provide meaningful anti-aging, vitality, cognitive, cardiovascular, immune, muscle recovery, cellular repair, and energy-related benefits. NAD+ is a vital coenzyme found in the body's cells that helps the body convert food into energy and repair our cellular DNA. However, the studies that Defendants rely on to make these claims do not actually support the Products' claims. Defendants' advertising campaign falsely conveyed messaging about the Products' capabilities by overstating their anti-aging outcomes.







3. "Snake oil" salesmen scams are some of the oldest tricks in the book. Exploitative scammers and businesses sell "cure all" products that prey on the anxieties of vulnerable consumers. Defendants' Products are the newest iteration of this age-old scheme, promising youthful vitality through its Products.

4. Defendants are capitalizing on the newest health movement, "bio-hacking," which is the practice of using diet, health data tracking, and supplements to increase one's maximum lifespan and longevity, to sell the Products and exploit vulnerable consumers' anxieties about their health declining as they age.[1]

5. In reality, Defendants' advertising materially overstated and misrepresented the underlying science concerning the Products and falsely translated biomarker and mechanistic findings into broad consumer-perceptible health and anti-aging claims.

6. Defendants aggressively marketed the Products through Amazon.com, Defendants' own websites, social media, podcasts, influencers, testimonials, digital advertising, and subscription programs as scientifically validated "longevity" supplements backed by human clinical science.

[1] https://dontdie.bryanjohnson.com/; https://www.scripps.org/news_items/7709-what-is-biohacking-how-does-it-work. (last visited August 10, 2026).

7. Independent review by the National Advertising Division and National Advertising Review Board ("NARB") determined that Defendants' challenged advertising claims conveyed misleading messages to consumers and recommended that Defendants discontinue or modify numerous "clinically proven," anti-aging, vitality, and health-benefit claims.

8. Specifically, the National Advertising Division and the NARB concluded that Defendants improperly translated biomarker and mechanistic findings concerning NAD+ into broad consumer-perceptible health and anti-aging claims.

9. The NARB specifically concluded that many of Defendants' claims went beyond cell-level mechanistic effects and that Defendants promised perceptible or functional health benefits that were not supported by the science Defendants relied upon.

10. In simple terms, Defendants have taken the fact that their Products *may* increase NAD+ levels in the blood to make sweeping, definite, promises about the down-stream health effects that consumption of the Products "will" have, with no concrete scientific foundation to back it up. Defendants have taken limited biomarker and mechanistic findings and translated them into broad pronouncements about their Products' supposed anti-aging and wellness capabilities to consumers. This is many steps too far from what published scientific literature actually confirms and Defendants were put on notice through the National Advertising Division and NARB proceedings. Defendants have even conceded their egregious misconduct in agreeing to remove the challenged claims from their Products' packaging.

11. Every day reasonable consumers are not in a position to independently evaluate whether complex scientific and clinical claims concerning NAD+, cellular repair, healthy aging, cognition, vitality, energy production, and anti-aging effects are actually supported by rigorous human clinical science.

12. As a result, a substantial portion of Defendants' profits are attributable to their false and misleading "clinically proven," anti-aging, vitality, and health-

benefit claims. But for Defendants' false and misleading "clinically proven" and anti-aging representations, the fair value of the Products would have been substantially lower.

13. Put differently, Defendants' misrepresentations allowed them to overcharge consumers in the amount of the clinically-proven and anti-aging related price premium. Relatedly, Defendants' false and misleading representations induced reasonable consumers like Plaintiffs into purchasing the Products.

14. Had Plaintiffs and all other similarly situated consumers known that, contrary to Defendants' representations, the Products do not actually provide the broad functional and consumer-perceptible health and anti-aging benefits conveyed by Defendants' advertising, they would have paid less for the Products or not purchased them at all.

15. Plaintiffs now seek a return of the clinically proven and anti-aging related premiums that Defendants charged for their Products on behalf of Plaintiffs and all other similarly situated purchasers. Plaintiffs assert claims on behalf of themselves and all other similarly situated purchasers of Defendants' Products for: (i) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq*.; (ii) violation of California's Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq*. ("CLRA") (iii) violation of California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, *et seq*.; (iv) violation of the Arizona Consumer Fraud Act A.R.S. §§ 44-1521, *et seq*.; (v) violation of the Maryland Consumer Protection Act Md. Comm. Code §§ 13-301, *et seq*.; (vi) fraud; (vii) unjust enrichment; and (viii) breach of express warranty.

## **PARTIES**

16. Plaintiff Melissa Jacobs is a citizen of California and resides in Newport Beach, California. Plaintiff Jacobs purchased Tru Niagen 300mg in April 2026 from Amazon.com for approximately $49 plus tax.

17. Plaintiff Caryn Hart is a citizen of California and resides in Encinitas, California. Plaintiff Hart last purchased Tru Niagen 300mg 30 ct. from Sprouts Farmers Market in Encinitas, California in May 2026 for $44.99 plus tax.

18. Plaintiff Clare Erslev is a citizen of Maryland and resides in Silver Spring, Maryland. Plaintiff Erslev last purchased Tru Niagen 300mg 90 ct. in Silver Spring, Maryland directly from Defendants' website in September 2025 for $101.60.

19. Plaintiff Anise Ivey is a citizen of Arizona and resides in Mesa, Arizona. Plaintiff Ivey last purchased Tru Niagen 300mg. 30 ct. in Mesa, Arizona from Amazon.com in November 2025 for $40.20.

20. Defendant Niagen Bioscience, Inc. is a Delaware corporation with headquarters in 10900 Wilshire Blvd., Suite 600 Los Angeles, California 90024. Defendant Niagen Bioscience manufactures, markets, distributes, advertises, and sells the Products in the United States, including in California and in this District, through brick-and-mortar stores and throughout numerous retailers online.

21. Defendant ChromaDex, Inc. is a California Corporation with its headquarters at 10900 Wilshire Blvd., Suite 600 Los Angeles, California 90024. Defendant licenses, markets, distributes, advertises, and sells the Products in the United States, including in California and this District, through brick-and-mortar stores and throughout numerous retailers online.

## JURISDICTION AND VENUE

22. This Court has subject-matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, Pub. L. No. 109-2 Stat. 4 ("CAFA"), which amends 28 U.S.C. § 1332, at new subsection (d), conferring federal jurisdiction over class actions where, as here: (a) there are 100 or more members in the proposed Class; (b) some members of the proposed Class have a different citizenship from the Defendants; and (c) the claims of the proposed class members exceed the sum or value of five million dollars ($5,000,000) in aggregate. *See* 28 U.S.C. § 1332(d)(2) and (6).

23. This Court has personal jurisdiction over Defendants because they market and sell the Products in California, maintain substantial business operations in California, and purposefully avail themselves of the California market.

24. Venue is proper in this Court under 28 U.S.C. § 1391 because Defendants are headquartered in this District; Defendants transact significant business within this District; some Plaintiffs reside within this District; a substantial part of the events giving rise to Plaintiffs' claims took place within this District; and this case was consolidated before the Court in this District.

## FACTUAL ALLEGATIONS

### A. The NAD+ and Longevity Supplement Market

25. Over the past few decades, a growing number of consumers have expressed serious concern with the long-term health effects of aging, including cognitive decline, fatigue, skin degradation, and loss of vitality. In response, a massive "longevity," anti-aging, and cellular-health supplement industry has emerged. Consumers increasingly seek dietary supplements marketed as capable of improving cellular health, slowing aging, increasing vitality, improving cognition, enhancing energy production, supporting physical and mental recovery, and extending one's life span.

26. The fast-growing trend of preventative health measures and self-optimization, popularized by celebrities and health influencers like Andrew Huberman, Bryan Johnson, and Gary Brecka, has created a boon for supplement companies that promote anti-aging and cellular metabolism products.[2]

27. The bio-hacking and health data tracking market has also exploded in recent years, with the increased popularity of wearable trackers and watches, genetic testing kits, and health apps that monitor health markers, including one's biological and metabolic age.

[2] https://www.nytimes.com/2026/05/23/well/nad-longevity-supplement-antiaging.html (last visited August 10, 2026).

28. An important aspect of these health trends is adding an extensive supplement routine to increase levels of specific vitamins and nutrients that fill the gaps in an average diet and combat factors associated with aging like focus, stress, sleep and other factors that impact health and longevity.[3]

29. Consumers are increasingly seeking supplements that are marketed as capable of improving cellular health, increasing cellular energy production, and expanding one's lifespan. One such supplement is NAD+.

30. NAD+ is a coenzyme found in every cell in the body. The body needs NAD+ to convert food into energy, regulate gene activity, and coordinate the body's stress and immune responses.

31. As people age, their NAD+ levels steadily decline, which makes the body less efficient at making energy and repairing cellular damage accumulated over time from lifestyle factors like alcohol consumption, stress and a sedentary lifestyle.[4] Lower NAD+ levels have been linked to various age-related changes, such as muscle loss and fatigue, metabolic issues and cognitive decline, among others.[5]

32. NAD+ is hard to absorb in supplement form, so supplements typically claim to include ingredients that fuel NAD+ production, so the body can create NAD+ molecules on its own.

33. One of those ingredients is nicotinamide riboside ("NR"). NR is the active ingredient in the Products and other NAD+ supplements. Defendants market NR as a "precursor," which are substances the body uses to make NAD+ on its own.[6] Thus, Defendants claim that taking the prescribed supplement every day will provide

---

[3] https://biogena.com/en/knowledge/blog/biohacking-supplements (last visited August 10, 2026).

[4] https://health.clevelandclinic.org/nad-supplement (last visited August 10, 2026).

[5] https://my.clevelandclinic.org/health/body/nad-nicotinamide-adenine-dinucleotide (last visited August 10, 2026).

[6] https://health.clevelandclinic.org/nad-supplement (last visited August 10, 2026).

the building blocks the body needs to produce more NAD+ levels (and thereby counteract aging).

34. Products marketed as capable of increasing NAD+ levels are heavily advertised using scientific and medical terminology concerning "cellular repair," "healthy aging," "cellular energy," "mitochondrial function," "longevity," and anti-aging science.

35. While many NAD+ supplements, including Defendants' Products, claim that their supplement will increase NAD+ levels, research on NAD+ supplements and their various health benefits is still developing. Researchers are still investigating all of the long-term benefits and risks associated with taking NAD+ supplements. Currently, the total research is limited or inconclusive at best and does not support Defendants' Products' claims.[7]

36. Despite the ongoing research, there has been a boom in the NAD+ supplement market, which was valued at $252 million in 2024 and projected to reach $884 million by 2034.[8] Leaders in these health movements tout NAD+ supplements as a vital health intervention to prevent aging and optimize mental and physical performance as people get older.[9]

37. Doctors and health researchers, on the other hand, recommend that the best ways to increase one's NAD+ levels are through diet and exercise changes, such as increasing daily physical activity, eating a nutrient-rich diet, and managing daily stress.[10]

---

[7] *Id.*

[8] https://www.insightaceanalytic.com/report/nad-based-anti-aging-market-size-share--trends-analysis-report (last visited August 10, 2026).

[9] https://www.nad.com/news/andrew-hubermans-updated-supplement-stack-for-2026. (last visited August 10, 2026).

[10] https://my.clevelandclinic.org/health/body/nad-nicotinamide-adenine-dinucleotide (last visited August 10, 2026).

38. Despite this, Defendants marketed the Products as capable of increasing NAD+ levels and "clinically proven" to provide a broad range of health benefits, including, among other claims, that the Products "support[] heart health," "support[] brain health," broader vitality and anti-aging claims, and claims framed as addressing support at the cellular level (*e.g.*, "supports cellular energy that your heart cells need").[11]

39. Consumers place substantial weight on representations that products are "clinically proven," "scientifically backed," or supported by ***human*** clinical studies and rely on product manufacturers to accurately represent the available science said representations are based on.

40. Consumers are willing to pay a premium for products whose effects are represented as "clinically proven" and scientifically demonstrated to provide meaningful anti-aging and health benefits. Being able to make "clinically proven" and anti-aging claims is therefore a substantial boon for supplement manufacturers, and Defendants know it. Such claims signal to consumers that the Products are supported by rigorous clinical science and capable of delivering meaningful real-world health benefits.

41. Accordingly, Defendants are aware that consumers are willing to pay a premium for products that claim they are "clinically proven" to work and that their benefits are scientifically proven.

42. Defendants intentionally positioned Tru Niagen as a premium, scientifically validated longevity product supported by cutting-edge clinical science. Compared to ordinary dietary supplements, Tru Niagen was sold at materially higher prices that consumers were deceived into paying because consumers believed they were purchasing a supplement that had been clinically demonstrated through

[11] https://bbbprograms.org/media/newsroom/decisions/niagen (last visited August 10, 2026).

rigorous human science to provide the meaningful anti-aging and health-support benefits Defendants claimed.

43. Consumers are particularly susceptible to such advertising because aging, cognitive decline, energy loss, vitality decline, and long-term health deterioration are deeply important personal concerns affecting daily life and future health.

44. Defendants have profited greatly from consumer demand for NAD+ and longevity products, and touted in 2024 to have sold over 8 million units of the Products globally.[12]

**B. NAD+, Nicotinamide Riboside, and Biomarker Science**

45. Nicotinamide riboside ("NR"), the active ingredient in Tru Niagen, is marketed as a precursor capable of increasing NAD+ levels within the body.

46. Defendants aggressively marketed Tru Niagen as capable of increasing NAD+ levels and thereby improving numerous aspects of health and aging.

47. Defendants repeatedly made broad representations, linking increases in NAD+ levels to positive health effects concerning vitality, healthy aging, cellular repair, cognitive support, cardiovascular health, immune support, muscle recovery, energy production, and anti-aging benefits.

48. Defendants' marketing campaign conveyed to reasonable consumers that Tru Niagen had been tested in clinical settings and demonstrated meaningful real-world health improvements.

49. Defendants' advertising relied heavily upon "clinically proven" messaging and references to human clinical studies. Defendants also used testimonials, influencer marketing, and social media content conveying real-world improvements in vitality, energy, cognition, recovery, and healthy aging.

---

[12] https://www.truniagen.com/blogs/tru-niagen-labs/navigating-nr-nmn-and-other-nad-precursors-to-find-the-best-nad-supplement (last visited August 10, 2026).

50. Reasonable consumers understand such representations to mean that the Products have been clinically proven through competent and reliable human clinical science to provide the meaningful represented functional health benefits.

51. But biomarker changes alone do not establish that consumers will experience meaningful or functional health improvements.

52. Likewise, cellular or mechanistic findings do not establish clinically meaningful anti-aging, vitality, cardiovascular, cognitive, immune, recovery, or energy-related benefits in humans.

53. Defendants nevertheless blurred these crucial distinctions throughout their advertising campaign. Defendants repeatedly paired references to NAD+ increases and cellular effects with broader health and anti-aging claims conveying real-world consumer benefits. Defendants thereby falsely conveyed to reasonable consumers that the Products had been clinically demonstrated to provide meaningful health and anti-aging effects when in fact the scientific data Defendants rely on does not support Defendants' claims. Defendants intentionally misrepresented the available scientific data to bolster their Products' claims and deceived reasonable consumers into believing the Products were capable of delivering definitive anti-aging benefits.

54. Defendants possessed superior knowledge regarding the limitations of the underlying clinical evidence and the distinction between biomarker findings and clinically demonstrated functional health outcomes. Defendants nevertheless chose to market the Products using broad "clinically proven," anti-aging, vitality, and health-benefit messaging to capitalize on consumer demand for scientifically validated longevity products.

**C. Defendants' Products and Advertising**

55. At issue in this action are Defendants' Tru Niagen Products, including the Tru Niagen 300mg Product purchased by Plaintiffs and all substantially similar Tru Niagen Products marketed using the same or substantially similar claims across

their labeling, packaging, subscription programs, testimonials, social media and influencer campaigns and digital advertising.[13]







56. Defendants crafted a common advertising campaign across their packaging, websites, Amazon listings, testimonials, influencer campaigns, podcasts, subscription programs, and digital advertising that paired "clinically proven" and human-clinical-science messaging with representations concerning anti-aging,

---

[13] https://digitaleverything.consulting/client/nutraceutical-supplement-brand/; https://www.truniagen.com/products/tru-niagen-300mg? (last visited August 10, 2026).

vitality, cognition, cardiovascular health, immune health, cellular energy, recovery, and healthy aging. Specifically, Defendant marketed the Products as capable of increasing NAD+ levels and "clinically proven" to provide a broad range of health benefits, including, among other claims, that the Products "support[] heart health," "support[] brain health," broader vitality and anti-aging claims, and claims framed as addressing issues at the cellular level (*e.g.*, "supports cellular energy that your heart cells need).

**How to Use**

- Adults can take one capsule 1-3 times daily as needed or as recommended by your healthcare professional.
- Tru Niagen is meant to be taken daily. 300mg is clinically proven to increase NAD+ levels by over 50%.
- Depending on your lifestyle, stressors, and diet, you can further supplement with Tru Niagen by adding an additional capsule.
- Tru Niagen is safe to consume up to 2,000mg/day.






57. Indeed, before consumers are able to purchase the Products on Defendants' website, they see the same claims Defendants have touted on social media through other advertising: that the Products are "clinically proven" to increase NAD+ levels and support various health issues and provide anti-aging benefits.




58. Defendants' marketing campaign conveyed to reasonable consumers that the Products had demonstrated meaningful results in broad, substantiated clinical testing to increase these biomarkers and provide actual health benefits to all consumers.

59. On their Amazon page, Defendants repeat the claims that the Products are "clinically proven to be one of the safest and most efficient boosters of NAD+ levels" and that their Products can increase NAD+ levels by over 50% in just 2 weeks, as well as the other false health representations.




**[INTENTIONALLY BLANK]**

**About this item**

- A COMPLETE ANTI AGING SUPPLEMENT - Support whole body wellness and boost cellular energy with Tru Niagen, a patented NAD+ supplement that supports the 37.2 trillion cells in your body Tru Niagen helps the production of nicotinamide adenine dinucleotide to promote healthy cell activity and can help reduce aging-related health concerns. Tru Niagen is clinically proven to be one of the safest and most efficient boosters of NAD+ levels, shown to increase NAD+ over 50% in just 2 weeks with daily use.
- VITAL FOR CELLULAR ENERGY - Tru Niagen supports your ability to stay healthy by boosting NAD+ levels, which naturally decline as you age. NAD+ is vital for cells to function and repair. It supports brain health, muscle health and recovery, heart health, cellular energy and repair, and lifestyle stress management. Patented Tru Niagen is more efficient at raising NAD+ than other NAD+ precursors such as NMN, niacinamide, or niacin.
- TRU STORY: WITHOUT NAD, CELLS DIE - Our bodies naturally decrease in NAD+, with up to a 65% decline between ages 30-70. Effects of metabolic stress and time on your cells can accelerate aging, which leads to many health concerns. Everyone's body, stressors, and goals are different. Most clinical studies have used 1000mg daily. NAD+ decline begins in your 30s, it's recommended to start with 300mg daily. As you age and are exposed to more metabolic stressors, such as environmental factors or immune challenges, you can move to 1000mg daily. Always check with your healthcare provider for the best dose for you.
- TESTED FOR SAFETY, POTENCY, AND PURITY - Tru Niagen is one of the most well-studied, patented, supplements. Our patented ingredient Niagen has achieved regulatory acceptance by the US FDA for use in supplements: twice as an NDI (New Dietary Ingredient), and once as GRAS (Generally Recognized As Safe). Every batch is made in the United States with globally sourced ingredients and third-party tested by ISO/IEC accredited labs for potency, safety, and purity. Tru Niagen NAD+ capsules are vegetarian, gluten free, nut free, caffeine free, and have no artificial flavors or colors.
- SUPPORTED BY DECADES OF RESEARCH - Tru Niagen is one of the most well-researched patented supplements and is backed by a Nobel Prize winner, 50 owned and licensed patents, 500+ published scientific studies, 300+ global research collaborations, and 40+ clinical trials. Supported by decades of science and research, Tru Niagen is truly one-of-a-kind.

^ Show less

60. On Defendants' website, they consistently claim that the Products are "clinically proven" and "scientifically researched" to provide the claimed benefits,

both on the opening page and on the pages to purchase the Products, advertising to consumers that the Products are a health product supported by scientific consensus.

## Backed by gold standard science, quality, and safety



### Efficacy backed by peer-reviewed published research

Niagen® is supported by 45+ clinical studies demonstrating its safety and efficacy. These human studies form the foundation of our scientific evidence. Over 65% of registered ongoing or completed nicotinamide riboside trials use Niagen®.[2]

**Partnership with 300+ institutions:** We partner with top institutions like Mayo Clinic, National Institute on Aging, Harvard, and Cambridge.

**Backed by independent research:** Over 90% of peer-reviewed, published Niagen® studies are investigator-driven and third-party funded.

View studies and publications ⌄

**[INTENTIONALLY BLANK]**

61. Defendants' marketing strategy includes pervasive use of social media and influencer campaigns. One search on Instagram or TikTok pulls several paid videos of influencers discussing the Products and their "health benefits." In one TikTok video posted on March 23, 2026, an influencer discusses how famous health guru, Bryan Johnson, uses Defendants' Products to "get his NAD+ levels equal to that of a 16-year-old." That video was viewed over 170,000 times as of June 4, 2026.







62. Through their pervasive advertising campaign, Defendants conveyed to reasonable consumers that the Products' claims had been clinically demonstrated through rigorous human science to provide meaningful real-world anti-aging and health benefits when those studies do not support the Products' claims. Defendants misrepresented those studies' findings to bolster their Products' sales. Defendants' advertising included, among other things, the following representations:

(a) Clinically proven to significantly increase NAD+ levels;

(b) Clinically proven to maintain NAD+ levels with daily use;

(c) representations linking NAD+ increases to heart health, brain health, immune health, vitality, and recovery;

(d) representations concerning "cellular energy," "cellular repair," "longevity," and "healthy aging" and other similar scientific and anti-aging terminology;

(e) anti-aging representations, both express and implied; and

(f) representations conveying that the Products were capable of producing meaningful functional and perceptible health improvements.

And as noted, Defendants further used testimonials and influencer advertising conveying real-world improvements in vitality, energy, recovery, cognition, and anti-aging benefits.

63. Reasonable consumers would understand Defendants' representations to mean that the Products' claims are accurate and rooted in scientific findings and actually provide meaningful real-world anti-aging and health benefits, rather than merely affecting laboratory biomarkers or cellular mechanisms without corresponding functional outcomes.

64. Defendants made the same implied representation throughout their advertising campaign: namely, that the Products' supposed scientifically backed claims are indeed accurate and had been clinically demonstrated through rigorous human science to provide meaningful real-world health and anti-aging benefits. In reality, Defendants misrepresented the science as affirmatively supporting the Products' capabilities when the available science has confirmed the Products' purported benefits are not possible .

**D. The National Advertising Division and NARB Determined Defendants' Claims Were False and Misleading**

65. Defendants rely heavily on the claim that the Products were "clinically proven" to provide these health benefits. Consumers understand the terms "clinically proven" to mean that the Products' effectiveness is broadly supported by the scientific community and generally found in clinical results. Put simply,

consumers rely on that term and understand it to mean that Defendants' claims are supported by reliable, scientific evidence in controlled studies, so they can trust that the Products will actually provide results.

66. However, the underlying clinical evidence on supplements that use NR to increase NAD+ levels has shown far less than clinically proven, conclusive results contrary to Defendants' representations.

67. In fact, following a challenge brought by Reus Research LLC, the National Advertising Division of the Better Business Bureau reviewed Defendants' challenged advertising claims concerning Tru Niagen. The National Advertising Division evaluated Defendants' "clinically proven" establishment claims, including the claim that Tru Niagen was "clinically proven to significantly increase NAD+ levels, and help maintain them with daily use." The National Advertising Division concluded that the evidence relied upon by Defendants did not support the broad clinically demonstrated anti-aging and health-benefit messages conveyed to consumers.

68. The National Advertising Division further concluded that Defendants improperly linked NAD+ biomarker increases to broad health-related benefits. And the National Advertising Division specifically recognized that claims framed in cellular or mechanistic language may nevertheless convey broader consumer-perceptible health benefits depending on context, surrounding claims, testimonials, and related advertising.

69. The National Advertising Division also determined that Defendants' advertising conveyed false and misleading messages concerning cardiovascular health, cognitive health, immune health, metabolism, anti-aging, vitality, exercise, muscle recovery, and cellular repair.

70. The National Advertising Division additionally determined that certain testimonials conveyed false and misleading messages regarding improvements in health, vitality, and functional benefits.

71. The National Advertising Division further reviewed Defendants' influencer marketing practices and recommended that Defendants ensure material connections were clearly and conspicuously disclosed.

72. During the proceeding, Defendants voluntarily agreed to discontinue certain challenged claims, including reproductive health, sleep improvement, and "Made in USA" claims.

73. Defendants appealed the National Advertising Division's decision to the National Advertising Review Board ("NARB").

74. On May 21, 2026, the NARB affirmed the National Advertising Division's findings and recommendations. The NARB agreed that Defendants' studies did not support the challenged "clinically proven" claims as conveyed to consumers. The NARB further determined that Defendants' challenged advertising improperly conveyed that biomarker increases translated into clinically demonstrated real-world health and anti-aging outcomes.

75. The NARB specifically determined that many of Defendants' claims went beyond cell-level mechanistic effects and falsely promised perceptible or functional health benefits that were not supported by the science relied upon by Defendants.

76. The NARB further recommended discontinuation of anti-aging claims and testimonials communicating perceptible real-world improvements.

77. The NARB additionally recommended discontinuation or modification of claims relating to heart health, brain health, immune health, vitality, muscle recovery, energy, and cellular repair. Defendants thereafter publicly stated that they would comply with the NARB's recommendations.

78. As further illustrated in the image below, Defendants' Amazon listing described the Products as "A COMPLETE ANTI AGING SUPPLEMENT" supporting "brain health, muscle health and recovery, heart health, cellular energy and repair" — the precise health-benefit categories the NARB determined were

unsupported — immediately following a "clinically proven" establishment claim, conveying to reasonable consumers that all such benefits had been clinically demonstrated.

### E. But for Defendants' Misrepresentations, Plaintiffs and the Proposed Class Would Have Paid Less for the Products

79. By falsely claiming that the Products were clinically proven and scientifically demonstrated to provide broad anti-aging and health benefits, and misrepresenting the available scientific data, Defendants were able to overcharge Plaintiffs and the proposed Class members in the amount of a clinically-proven and anti-aging related premium associated with those claims.

80. Defendants' clinically proven and anti-aging claims appeared prominently on the webpages where the Products were sold, including Amazon.com and Defendants' own websites, and were uniformly presented to consumers at or near the point of purchase.

81. Defendants' claims misled reasonable consumers. Defendants are among the most prominent participants in the NAD+ supplement marketplace, so consumers would reasonably believe Defendants' representations. Moreover, consumers do not and cannot independently evaluate the scientific validity of complex claims concerning NAD+, cellular repair, healthy aging, cognition, vitality, and anti-aging effects before purchasing dietary supplements.

82. If Defendants had been truthful in their representations about the Products, namely, that the Products were not clinically proven to provide the broad health and anti-aging benefits conveyed by Defendants' advertising, then the market price of the Products would have been lower. Accordingly, Plaintiffs and the proposed Class paid for Defendants' Products at artificially inflated prices.

## PLAINTIFFS' EXPERIENCES

**Plaintiff Melissa Jacobs**

83. In April 2026, Plaintiff Melissa Jacobs purchased Defendants' Tru Niagen 300mg Product from Amazon.com while in Newport Beach, California for approximately $49 plus tax.

84. Plaintiff Jacobs is a health and wellness advocate and owns and operates a Pilates studio. Longevity, healthy aging, and wellness are important to Plaintiff Jacobs.

85. Before purchasing the Product for the first time, Plaintiff Jacobs reviewed the Tru Niagen Amazon product page and related advertising, including representations that the Products were "clinically proven," supported "Brain Function," "Anti Aging," "Cell Regeneration," "Cellular Energy," and related anti-aging and health benefits, and that Tru Niagen was "clinically proven to be one of the safest and most efficient boosters of NAD+ levels, shown to increase NAD+ over 50% in just 2 weeks with daily use."

86. Plaintiff Jacobs further reviewed the "About this item" section of the Amazon product listing, which described the Products as "A COMPLETE ANTI AGING SUPPLEMENT" that "can help reduce aging-related health concerns" and represented that the Products support "brain health, muscle health and recovery, heart health, cellular energy and repair."

87. Plaintiff Jacobs relied on these claims when purchasing the Product and they were a substantial reason she purchased the Product.

88. Even though the Product was more expensive than generic dietary supplements, Plaintiff Jacob paid a price premium based on the Product's representations as discussed above, including the claim that the Product was "clinically proven" to increase NAD+ levels.

89. After using the Product consistently and as directed, Plaintiff Jacobs felt none of the promoted health benefits, and ceased using the Product, as it did not

provide the benefits claimed by Defendants.

90. Had Plaintiff Jacobs known that the Product were not "clinically proven" to increase NAD+ levels, and were not proven to provide tangible health benefits, like cellular repair, anti-aging, heart health, and muscle health among other claims, Plaintiff Jacobs would not have purchased the Product, or at least would have paid substantially less.

91. Plaintiff Jacobs desires to purchase products like the Products in the future and would consider purchasing the Products again if Plaintiff could trust that Defendants' representations concerning the Products were truthful, accurate, and non-misleading.

**Plaintiff Caryn Hart**

92. In May 2026, Plaintiff Caryn Hart purchased Defendants' Products in person at her local Sprouts Farmer Market location in Encinitas, California for $45 plus tax.

93. Plaintiff Hart cares about her long-term health and consciously takes preventative measures to increase her wellness and longevity.

94. Before purchasing the Products for the first time, Plaintiff Hart saw videos on social media posted by wellness influencers promoting Defendants' claims, which Defendants distribute to influencers for their promotional content, including but not limited to, that the Products were clinically proven to increase NAD+ levels and various health claims that the Products supported cellular health, anti-aging and longevity.

95. Plaintiff Hart also reviewed the language on the labeling, which include Defendants' health claims, such as "age better."

96. Plaintiff Hart relied on these claims when purchasing the Products and they were a substantial reason she purchased the Products.

97. Even though the Products were more expensive than generic dietary supplements, Plaintiff Hart chose to pay a premium price based on the Products'

representations as discussed above, including the claim that the Products were "clinically proven" to increase NAD+ levels.

98. After using the Products consistently and as directed, Plaintiff Hart felt none of the promoted health benefits, and ceased using the Products, as they did not provide the benefits claimed by Defendants.

99. Had Plaintiff Hart known that the Products were not "clinically proven" to increase NAD+ levels, and were not proven to provide tangible health benefits, like cellular repair, anti-aging, heart health, and muscle health, among other claims, Plaintiff Hart would not have purchased the Products, or at least would have paid substantially less.

100. Plaintiff Hart desires to purchase products like the Products in the future and would consider purchasing the Products again if Plaintiff could trust that Defendants' representations concerning the Products were truthful, accurate, and non-misleading.

**Plaintiff Clare Erslev**

101. Plaintiff Clare Erslev purchased Defendants' Products from the Tru Niagen website multiple times in Silver Spring, Maryland, with the last purchase dated September 2, 2025. Plaintiff purchased the 300 mg 90 count bottle of the Products for $101.60 not including tax.

102. Before purchasing the Products, Plaintiff Erslev reviewed the language on the Tru Niagen website, including the claims that the Products are "clinically proven" to increase NAD+ levels by 50%.

103. Plaintiff Erslev relied on these claims when purchasing the Products, and they were a substantial reason why she chose to purchase the Products.

104. Even though the Products were more expensive than generic dietary supplements, Plaintiff Erslev chose to pay a premium price based on Defendants' representations as discussed above, including the claim that the Products were "clinically proven" to increase NAD+ levels.

105. After using the Products consistently and as directed, Plaintiff Erslev felt none of the promoted health benefits, and ceased using the Products, as they did not provide the benefits claimed by Defendants.

106. Had Plaintiff Erslev known that the Products were not "clinically proven" to increase NAD+ levels, and were not proven to provide tangible health benefits, like supporting cellular repair, anti-aging, heart health, and muscle health, among other claims, Plaintiff Erslev would not have purchased the Products, or at least would have paid substantially less.

107. Plaintiff Erslev desires to purchase products like the Products in the future and would consider purchasing the Products again if Plaintiff could trust that Defendants' representations concerning the Products were truthful, accurate, and non-misleading.

**Plaintiff Anise Ivey**

108. Plaintiff Anise Ivey purchased the Products multiple times from Defendants' Amazon storefront while in Mesa, Arizona. She last purchased the Products in November 2025. Plaintiff Ivey purchased the Tru Niagen 300mg. 30 ct. from Amazon.com for $40.20.

109. When purchasing the Products on Defendants' Amazon storefront, Plaintiff Ivey viewed Defendants' claims that the Products were "clinically proven" to increase NAD+ levels with 2 weeks of daily use, and that the Products can provide actual health benefits, like supporting "brain health, muscle health and recovery, heart health, cellular energy and repair, and lifestyle stress management."

110. Plaintiff Ivey relied on Defendants' claims when she decided to Purchase the Products, and they were a substantial reason why she chose to purchase the Products.

111. Even though the Products were more expensive than generic dietary supplements, Plaintiff Ivey chose to pay a premium price based on Defendants'

representations as discussed above, including the claim that the Products were "clinically proven" to increase NAD+ levels.

112. After using the Products consistently and as directed, Plaintiff Ivey felt none of the promoted health benefits, and has ceased using the Products, as they did not provide the benefits claimed by Defendants.

113. Had Plaintiff Ivey known that the Products were not "clinically proven" to increase NAD+ levels, and were not proven to provide tangible health benefits, like supporting cellular repair, anti-aging, heart health, and muscle health, among other claims, Plaintiff Ivey would not have purchased the Products, or at least would have paid substantially less.

114. Plaintiff Ivey desires to purchase products like the Products in the future and would consider purchasing the Products again if Plaintiff could trust that Defendants' representations concerning the Products were truthful, accurate, and non-misleading.

## CLASS ALLEGATIONS

115. ***Class Definition***. Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), 23(b)(3), and 23(c)(4) on behalf of themselves and all other similarly situated consumers, and seeks to represent classes defined as:

> All natural persons Nationwide who purchased Defendants' Tru Niagen products during the applicable statutory period (the "Class").
>
> All natural persons who purchased Defendants' Tru Niagen products while in California during the applicable statutory period (the "California Subclass").
>
> All natural persons who purchased Defendants' Tru Niagen products while in Maryland during the applicable statutory period. (the "Maryland Subclass").

> All natural persons who purchased Defendants' Tru Niagen products while in Arizona during the applicable statutory period. (the "Arizona Subclass").

116. Excluded from the classes are governmental entities; Defendants; and Defendants' affiliates, parents, subsidiaries, employees, officers, directors, and co-conspirators. Also excluded is any judicial officer presiding over this matter and the members of their immediate families and judicial staff.

117. Plaintiffs reserve the right to modify or expand the definition of the classes to seek recovery on behalf of additional persons as facts are learned in further investigation and discovery.

118. ***Numerosity.*** Members of the classes are so numerous that their individual joinder herein is impracticable. The precise number of Class members and their identities are unknown to Plaintiffs at this time but will be determined through discovery of Defendants' records. Class members may be notified of the pendency of this action by mail, email, publication, and/or other media, including social media.

119. ***Commonality and Predominance***. Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. These common legal and factual questions include, but are not limited to:

a. Whether Defendants' "clinically proven" and anti-aging claims were false and/or misleading;

b. Whether Defendants' representations regarding the Products included false and/or misleading statements and/or omissions;

c. Whether Defendants knowingly made false and misleading "clinically proven" and health-benefit claims concerning the Products;

d. Whether Defendants' representations were material;

e. Whether an objectively reasonable consumer would have been misled by Defendants' representations; and

f. Whether Defendants' claims allowed them to charge more for the Products than they otherwise could have.

120. ***Typicality.*** Plaintiffs' claims are typical of the claims of the proposed classes because Plaintiffs, like all members of the classes, were induced by Defendants' false and misleading warranties to purchase Defendants' Products without knowing that the Defendants' claims about the Products were false and misleading.

121. The representative Plaintiffs, like all members of the classes, have been economically damaged by Defendants' misconduct in the very same way as the members of the classes.

122. Further, the factual bases of Defendants' misconduct are common to all members of the classes and represent a common thread of misconduct resulting in injury to all members of the classes.

123. ***Adequacy***. Plaintiffs are adequate representatives of the classes Plaintiffs seek to represent because Plaintiffs' interests do not conflict with the interests of the members of the classes; Plaintiffs have retained counsel competent and experienced in prosecuting class actions; and Plaintiffs intend to prosecute this action vigorously.

124. The interests of the members of the classes will be fairly and adequately protected by Plaintiffs and Plaintiffs' counsel.

125. ***Superiority***. A class action is superior to other available means for the fair and efficient adjudication of the claims of the members of the classes.

126. Each individual member of the classes may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability.

127. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also represents a potential for inconsistent or contradictory judgments.

128. By contrast, the class-action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court on the issue of Defendants' liability.

129. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## CAUSES OF ACTION

### COUNT I
### Violations of California's Unfair Competition Law ("UCL")
### Business & Professions Code §§ 17200, *et seq*.
### (On Behalf of the Class and/or California Subclass)

130. Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

131. Plaintiffs Jacobs and Hart bring this claim on behalf of themselves and the Classes, or, in the alternative, Plaintiffs Jacobs and Hart bring this claim on behalf of themselves and the California Subclass.

132. This claim is brought under the laws of California.

133. Defendants violated California's UCL by engaging in unlawful, fraudulent, and unfair conduct (*i.e.*, violating each of the three prongs of the UCL).

***The Unlawful Prong***

134. Defendants engaged in unlawful conduct by disseminating false and misleading advertising and false establishment claims in violation of California law and public policy prohibiting deceptive consumer advertising.

***The Fraudulent Prong***

135. As alleged in detail above, Defendants misrepresented material facts about the Products, including by falsely representing to consumers that the Products were clinically proven and scientifically demonstrated to provide meaningful anti-aging and health benefits.

136. Defendants, as manufacturers, marketers, licensors, distributors, and sellers of the Products, were in a position to know, and did know, the true nature and limitations of the science underlying the Products, but nevertheless affirmatively represented that the Products provided clinically proven and scientifically demonstrated health and anti-aging benefits.

137. As a result of these false and misleading practices, Defendants induced Plaintiffs and the members of the Classes to purchase the Products that Plaintiffs and the Classes would not have purchased, or would have paid substantially less for, had Defendants been truthful.

***The Unfair Prong***

138. Defendants' conduct was unfair because, by claiming that the Products were clinically proven and scientifically demonstrated to provide meaningful anti-aging and health benefits, Defendants deceived consumers into believing that the Products had been rigorously demonstrated through human clinical science to provide such benefits, even though they had not.

139. This conduct was unfair because it led Plaintiffs and the members of the Classes to purchase the Products that they otherwise would not have purchased, or would have paid substantially less for, had they not been advertised as clinically proven and scientifically demonstrated.

140. Defendants' misleading practices also gave Defendants an unfair advantage over competitors in the NAD+ and longevity supplement marketplace. Plaintiffs and the Class members could not reasonably have avoided the injury

because only Defendants possessed the underlying scientific information concerning the Products.

141. Defendants' false and misleading conduct was intended to induce reliance, and Plaintiffs and the members of the Classes saw, read, and reasonably relied upon Defendants' false and misleading representations. Defendants' deceptive, misleading, and unfair conduct was a substantial factor in Plaintiffs' and the Classes' purchasing decisions.

142. Defendants' misrepresentations were a substantial factor and proximate cause of the damages and losses suffered by Plaintiffs and the Classes. Plaintiffs and the Classes have suffered harm as a result of Defendants' violations of the UCL because they incurred charges and/or paid monies they otherwise would not have incurred or paid had Defendants advertised the Products truthfully.

143. There was no benefit to consumers or competition from Defendants' false and misleading "clinically proven" and anti-aging representations. Plaintiffs and the members of the Classes suffered harm because they incurred charges and paid monies they otherwise would not have paid had Defendants advertised the Products truthfully.

## COUNT II
**Violations of the California Consumers Legal Remedies Act,**
**(Cal. Civ. Code §§ 1750, *et seq*.)**
**(On behalf of the Class and/or the California Subclass)**

144. Plaintiffs incorporate by reference and re-allege all prior paragraphs of this complaint as though fully set forth herein.

145. Plaintiffs bring this claim on behalf of themselves and the Classes, or, in the alternative, Plaintiffs Jacobs and Hart bring this claim on behalf of themselves and the California Subclass.

146. The Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq*. ("CLRA"), is a comprehensive statutory scheme that is to be liberally construed to

protect consumers against unfair and deceptive business practices in connection with the conduct of businesses providing goods, property, or services to consumers primarily for personal, family, or household use.

147. In accordance with the liberal application and construction of the CLRA, application of the CLRA to the putative Classes in this action is appropriate because Defendants' wrongful conduct alleged herein originated in California, including but not limited to Defendants' unfair or deceptive marketing of the Products to the Classes emanating from Defendants' headquarters in Los Angeles, California, as well as Defendants' unfair or deceptive marketing of the Products to the California Subclass in the State of California.

148. Plaintiffs and the Class Members are "consumers" who purchased "goods" in the form of the Products within the meaning of Cal. Civ. Code §§ 1761(a) & (d).

149. Defendants are each a "person" within the meaning of Cal. Civ. Code § 1761(c).

150. The CLRA, Cal. Civ. Code §1770(a)(5), (7), & (9) provide, in part, as follows:

> (a) The unfair methods of competition and unfair or deceptive acts or practices listed in this subdivision undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer are unlawful:
>
> …
>
> (5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities which they do not have . . .;
>
> …
>
> (7) Representing that goods or services are of a particular standard, quality, or grade, or that goods

> are of a particular style or model, if they are of another.
>
> …
>
> (9) Advertising goods or services with intent not to sell them as advertised.

151. Defendants violated the CLRA, section 1770(a)(5), *inter alia*, by representing that the Products have sponsorship, approval, characteristics, uses or benefits, which they do not have, and/or CLRA section 1770(a)(7) by representing that the Products are of a particular standard, quality, or grade, even though they are of another, and/or CLRA section 1700(a)(9) by advertising the Products with intent not to sell them as advertised. Such conduct includes, among other things:

a. Marketing and selling the Products as being "clinically proven" to provide actual anti-aging health benefits;

b. Marketing and selling the Products as having demonstrated actual health benefits through rigorous scientific testing, even though they do not;

c. Marketing and selling the Products when they were not merchantable for the purposes they were advertised for;

d. Marketing and selling the Products while concealing material facts from Plaintiffs and Class Members regarding the abilities, features, or attributes of the Products;

e. Concealing from Class Members that Defendants were in breach and intended to breach their contractual obligations as set forth in this complaint;

f. Concealing from Class Members that Defendants were in breach and intended to breach their warranty obligations as set forth in this complaint; and

g. Violating additional laws and regulations as set forth herein.

152. Pursuant to California Civil Code sections 1752, 1780, and 1781, Plaintiffs, on behalf of themselves and other Class members, seek an order of this Court enjoining Defendants from the unlawful practices described herein and seek monetary relief from Defendants to provide actual, compensatory, statutory, and/or punitive damages, as well as an award of costs of litigation and attorneys' fees.

153. On or around June 17, 2026, Plaintiff Jacobs' counsel sent Defendants a CLRA notice letter, which complies in all respects with Cal. Civ. Code § 1782(a), attached hereto as **Exhibit A**. The letter was sent via certified mail, return receipt requested, advising Defendants that they were in violation of the CLRA and demanding that they cease and desist from such violations and make full restitution by refunding the monies received therefrom. The letter stated that it was on behalf of Plaintiff Jacobs and all other similarly situated purchasers. On or about June 18, 2026, Plaintiffs Hart, Erslev, and Ivey, on behalf of themselves and other Class members sent a CLRA notice of violation and demand letter via certified mail, return receipt requested to Defendants, attached hereto as **Exhibit B**. The letter advised Defendants that they were in violation of the CLRA and demanded they cease and desist from such violations and make full restitution by refunding the monies received therefrom.

**<u>COUNT III</u>**
**Violations of California's False Advertising Law ("FAL")**
**Business & Professions Code § 17500, *et seq.***
**(On Behalf of the Class and/or the California Subclass)**

154. Plaintiffs incorporate by reference and re-allege all prior paragraphs of this complaint as though fully set forth herein.

155. Plaintiffs Jacobs and Hart bring this claim on behalf of themselves and the Classes, or, in the alternative, Plaintiffs Jacobs and Hart bring this claim on behalf of themselves and the California Subclass.

156. California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, *et seq.,* makes it "unlawful for any person to make or disseminate or cause to

be made or disseminated before the public in this state . . . in any advertising device . . . or in any other manner or means whatever, including over the Internet, any statement, concerning . . . personal property or service, . . . or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

157. During the applicable statutory period, Defendants committed acts of false advertising, as defined by the FAL, by making false and misleading representations concerning the Products' clinically proven and scientifically demonstrated anti-aging and health benefits.

158. Defendants knew or should have known, through the exercise of reasonable care, that their claims were false and misleading.

159. Defendants' actions in violation of the FAL were false and misleading such that the general public was likely to be deceived.

160. As a direct and proximate result of these acts, consumers have been harmed, including Plaintiffs and the members of the Classes. Plaintiffs and the members of the Classes suffered injury and actual out-of-pocket losses because: (a) they would not have purchased the Products or would have paid substantially less for them absent Defendants' false advertising; (b) they paid increased prices for the Products based on Defendants' false advertising; and (c) the Products did not confer the value promised because they were not clinically proven to provide the broad anti-aging and health benefits conveyed by Defendants' advertising.

**COUNT IV**
**Violation of the Arizona Consumer Fraud Act**
**A.R.S. §§ 44-1521, *et seq.***
**(On Behalf of the Arizona Subclass)**

161. Plaintiffs incorporate by reference and re-allege all prior paragraphs of this complaint as though fully set forth therein.

162. Plaintiff Ivey ("Plaintiff" for purposes of this Count) brings this claim

on behalf of herself and the Arizona Subclass.

163. Defendants are each a "person" as defined by A.R.S. § 44-1521(6).

164. Defendants advertised, offered, or sold goods or services in Arizona and engaged in trade or commerce directly or indirectly affecting the people of Arizona.

165. Defendants engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts affecting the people of Arizona in connection with the sale and advertisement of "merchandise" (as defined in A.R.S. § 44-1521(5)) in violation of A.R.S. § 44-1522(A). Such conduct includes, among other things:

(a) Misrepresenting material facts about the Products, including that they are "clinically proven" to provide actual anti-aging health benefits to consumers;

(b) Misleading consumers to believe that the Products demonstrated actual health benefits through rigorous scientific testing, even though they do not;

(c) Marketing and selling Products that are not merchantable for the purposes they were advertised for;

(d) Marketing and selling the Products while concealing material facts from Plaintiff and Class Members regarding the abilities, features and attributes of the Products;

(e) Concealing from Class Members that Defendants were in breach and intended to breach their contractual obligations as set forth in this complaint;

(f) Concealing from Plaintiff and Class Members that Defendants were in breach and intended to breach their warranty obligations as set forth in this complaint; and

(g) Violating additional laws and regulations as set forth herein.

166. Defendants' representations and omissions were material because they were likely to deceive reasonable consumers.

167. Defendants intended to mislead Plaintiff and the Arizona Subclass members of the true nature of the Products and their ability to increase NAD+ levels, and their ability to provide actual health benefits to consumers. Plaintiff and the Arizona Subclass members acted reasonably in relying on Defendants' misrepresentations and omissions, the truth of which they could not have discovered.

168. Defendants acted intentionally, knowingly, and maliciously to violate the Arizona Consumer Fraud Act, and recklessly disregarded Plaintiff and Arizona Subclass members' rights. Defendants' knowledge that the Products would not produce the advertised health benefits put it on notice that the Products were not as advertised.

169. As a direct and proximate result of Defendants' unfair and deceptive acts or practices, Plaintiff and Arizona Subclass members have suffered and will continue to suffer injury, ascertainable losses of money and property, and monetary and non-monetary damages, including from not receiving the benefit of the bargain of the Products.

170. Plaintiff and the Arizona Subclass members seek all monetary and non-monetary relief allowed by law, including compensatory damages; disgorgement; punitive damages; and reasonable attorneys' fees and costs.

**COUNT V**
**Violation of the Maryland Consumer Protection Act**
**Md. Comm. Code §§ 13-301, *et seq*.**
**(On behalf of the Maryland Subclass)**

171. Plaintiffs incorporate by reference and re-allege all prior paragraphs of this complaint as though fully set forth therein.

172. Plaintiff Erslev ("Plaintiff" for purposes of this Count) brings this claim on behalf of herself and the Maryland Subclass.

173. Defendants are "persons" as defined by Md. Comm. Code § 13-101(h).

174. Defendants' conduct as alleged herein related to "sales," "offers for sale," or "bailment" as defined by Md. Comm. Code § 13-101(i) and § 13-303.

175. Maryland Subclass members are "consumers" as defined by Md. Comm. Code § 13-101(c).

176. Defendants advertise, offer, or sell "consumer goods" or "consumer services" as defined by Md. Comm. Code § 13-101(d).

177. Defendants advertised, offered, or sold goods or services in Maryland and engaged in trade or commerce directly or indirectly affecting the people of Maryland.

178. Defendants engaged in unfair and deceptive trade practices, in violation of Md. Comm. Code § 13-301, including:

179. False or misleading oral or written representations that have the capacity, tendency, or effect of deceiving or misleading consumers;

180. Representing that consumer goods or services have a characteristic that they do not have;

181. Representing that consumer goods or services are of a particular standard, quality or grade that they are not;

182. Failing to state a material fact where the failure deceives or tends to deceive;

183. Advertising or offering consumer goods or services without intent to sell, lease, or rent them as advertised or offered;

184. Deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with the promotion or sale of consumer goods or services or the subsequent performance with respect to an agreement, sale lease or rental.

185. Defendants engaged in these unfair and deceptive trade practices in connection with offering for sale or selling consumer goods or services or with

respect to the extension of consumer credit, in violation of Md. Comm. Code § 13-303. Such conduct includes, among other things:

(a) Misrepresenting material facts about the Products, including that they are "clinically proven" to provide actual anti-aging health benefits to consumers;

(b) Misleading consumers to believe that the Products demonstrated actual health benefits through rigorous scientific testing, even though they do not;

(c) Marketing and selling Products that are not merchantable for the purposes they were advertised for;

(d) Marketing and selling the Products while concealing material facts from Plaintiff and Class Members regarding the abilities, features and attributes of the Products;

(e) Concealing from Class Members that Defendants were in breach and intended to breach their contractual obligations as set forth in this complaint;

(f) Concealing from Plaintiff and Class Members that Defendants were in breach and intended to breach their warranty obligations as set forth in this complaint; and

(g) Violating additional laws and regulations as set forth herein.

186. Defendants' representations and omissions were material because they were likely to deceive reasonable consumers.

187. Defendants intended to mislead Plaintiff and Maryland Subclass members and induce them to rely on their misrepresentations and omissions.

188. Defendants misrepresented to Plaintiff and Maryland Subclass members the capabilities of the Products with regard to their ability to provide actual health benefits, and whether Defendants' claims of the Products' health benefits were clinically proven. Plaintiff and the Maryland Subclass members acted reasonably in

relying on Defendants' misrepresentations and omissions, the truth of which they could not have discovered.

189. Defendants acted intentionally, knowingly, and maliciously to violate Maryland's Consumer Protection Act, and recklessly disregarded Plaintiff and Maryland Subclass members' rights. Defendants' knowledge that Defendants' health claims were unsupported put them on notice that the Products were not as they advertised.

190. As a direct and proximate result of Defendants' unfair and deceptive acts and practices, Plaintiff and the Maryland Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Products.

191. Plaintiff and Maryland Subclass members seek all monetary and non-monetary relief allowed by law, including damages, disgorgement, and attorneys' fees and costs.

## COUNT VI
## Fraud
## (On Behalf of the Nationwide Class)

192. Plaintiffs hereby incorporate by reference the allegations contained in this Complaint.

193. Plaintiffs bring this claim individually and on behalf of the members of the Nationwide Class against Defendants under the laws of California and states with materially similar laws.

194. As alleged in detail above, Defendants falsely represented that the Products were clinically proven and scientifically demonstrated to provide meaningful anti-aging and health benefits.

195. Defendants were in a position to know, and did know, the true nature and limitations of the science underlying the Products, but nevertheless affirmatively represented that the Products were clinically proven and scientifically demonstrated.

196. Defendants knew that consumers would rely on their representations concerning clinical proof, anti-aging effects, and scientifically demonstrated health benefits when deciding whether to purchase the Products.

197. Defendants' misrepresentations, upon which Plaintiffs and the members of the Class relied, were intended to induce, and actually did induce, Plaintiffs and the members of the Class to purchase the Products.

198. Defendants induced Plaintiffs and the members of the Class to purchase the Products that Plaintiffs and the members of the Class would not have purchased, or would have paid substantially less for, had Defendants been truthful about whether the Products were clinically proven and scientifically demonstrated to provide meaningful anti-aging and health benefits.

199. Defendants' fraudulent actions caused damages to Plaintiffs and the Class who are entitled to damages and other legal and equitable relief as a result.

## COUNT VII
## Unjust Enrichment
## (On Behalf of the Nationwide Class)

200. Plaintiffs hereby incorporate by reference the allegations contained in this Complaint.

201. Plaintiffs bring this claim individually and on behalf of the members of the Nationwide Class against Defendants under the laws of California and states with materially similar laws.

202. As alleged in detail above, Defendants knowingly accepted and retained benefits from Plaintiffs and the Nationwide Class through the purchase of the Products.

203. Substantial benefits were conferred upon Defendants by Plaintiffs and the members of the Nationwide Class, and Defendants knowingly and voluntarily accepted and retained those benefits under inequitable circumstances.

204. Defendants either knew or should have known that the payments rendered by Plaintiffs and the Nationwide Class were given and received with the

expectation that the Products were clinically proven and scientifically demonstrated to provide meaningful anti-aging and health benefits.

205. It would be inequitable for Defendants to retain the benefits of those payments under these circumstances.

**COUNT VIII**
**Breach of Express Warranty**
**(On Behalf of the Nationwide Class)**

206. Plaintiffs bring this claim individually and on behalf of the members of the Nationwide Class and the California Subclass against Defendants under the laws of California.

207. As alleged in detail above, Defendants expressly warranted that the Products were clinically proven and scientifically demonstrated to provide meaningful anti-aging and health benefits.

208. Defendants' affirmations of fact and promises included, among other things, representations that the Products were "clinically proven," scientifically validated, and capable of providing anti-aging, vitality, cognitive, cardiovascular, immune, cellular-energy, recovery, and related health benefits. Specifically, Defendants marketed the Products as "A COMPLETE ANTI AGING SUPPLEMENT" supporting "brain health, muscle health and recovery, heart health, cellular energy and repair." Defendants further used testimonials and influencer advertising conveying real-world improvements in vitality, energy, recovery, cognition, and anti-aging benefits.

209. These affirmations and promises became part of the basis of the bargain between Defendants and Plaintiffs and the members of the Nationwide Class.

210. In fact, the Products did not conform to Defendants' affirmations and promises because the challenged claims were false and misleading.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court grant Plaintiffs and all members of the proposed Classes the following relief against Defendants:

(a) An order certifying the Classes under Rule 23 of the Federal Rules of Civil Procedure, and naming Plaintiffs' attorneys as Class Counsel to represent the members of the Classes;

(b) An order declaring that Defendants' conduct violates the statutes and common law referenced herein;

(c) An order finding in favor of Plaintiffs and the Classes on all counts asserted herein;

(d) Compensatory and statutory damages in amounts to be determined by the Court and/or jury;

(e) Prejudgment interest on all amounts awarded;

(f) Restitution and all other forms of equitable monetary relief;

(g) Injunctive relief as pleaded or as the Court may deem proper;

(h) An order awarding Plaintiffs and the Classes their reasonable attorneys' fees and expenses and costs of suit; and

(i) Granting such other and further relief as may be just and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all claims so triable.

Dated: August 14, 2026

**BURSOR & FISHER, P.A.**

By: *_/s/ L. Timothy Fisher_*
L. Timothy Fisher

L. Timothy Fisher (State Bar No. 191626)
Luke Sironski-White (State Bar No. 348441)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700

E-mail: ltfisher@bursor.com
lsironski@bursor.com

**SINDERBRAND LAW GROUP, P.C.**

By: /s/ *Greg Sinderbrand*
Greg Sinderbrand

Greg Sinderbrand (State Bar No. 179586)
2829 Townsgate Road, Suite 100
Westlake Village, CA 91361
Telephone: (818) 370-3912
E-mail: greg@sinderbrandlaw.com

**KAPLAN FOX & KILSHEIMER LLP**

By: /s/ *Laurence D. King*
Laurence D. King

Laurence D. King (SBN 206423)
Matthew B. George (SBN 239322)
Blair E. Reed (SBN 316791)
Sophia V. Pintar (SBN 367193)
1999 Harrison Street, Suite 1501
Oakland, CA 94612
Telephone: 415-772-4700
Facsimile: 415-772-4707
Email: *lking@kaplanfox.com*
*mgeorge@kaplanfox.com*
*breed@kaplanfox.com*
*spintar@kaplanfox.com*

Justin B. Farar (SBN 211556)
12400 Wilshire Boulevard, Suite 910
Los Angeles, CA 90025
Telephone: 310-614-7260
Email: *jfarar@kaplanfox.com*

*Co-Lead Interim Class Counsel and Attorneys for Plaintiffs*